UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
AT CHATTANOOGA

| | |
|---|---|
| DR. JEAN HOWARD-HILL, | ) |
| | ) |
| Plaintiff, | ) Case. No. 1:16-cv-441-SKL |
| | ) |
| v. | ) |
| | ) |
| CARLTON SPENCE, Individually and a/k/a | ) |
| Scott Spence, Individually, *et al.*, | ) |
| | ) |
| Defendants, | ) |

## **MEMORANDUM AND ORDER**

Before the Court is a motion for summary judgment and supporting memorandum filed by Defendants Carlton "Scott" Spence and Mini Max Storage (collectively, "Defendants")[1] on August 2, 2017 [Docs. 28 & 29]. Pro se Plaintiff Dr. Jean Howard-Hill ("Plaintiff") filed a response and supporting memorandum [Docs. 31 & 32], and Defendants filed a reply [Doc. 35]. Plaintiff then filed a motion to amend her response, with a supporting memorandum [Docs. 36 & 37]. Plaintiff also filed her own sur-reply to Defendants' reply [Doc. 39]. Defendants do not object to Plaintiff's motion to amend her response [*see* Doc. 38], nor have they objected to the Court's consideration of Plaintiff's sur-reply for the purpose of resolving this motion for summary judgment.[2] The Court will therefore grant Plaintiff's motion to amend her response [Doc. 37], and has considered all of Plaintiff's pleadings in issuing this decision.

---

[1] Although the complaint is styled as if there are multiple Defendants, it appears that Carlton "Scott" Spence d/b/a/ Mini Max Storage, is the owner/landlord of the rental units at issue and the sole Defendant. To avoid confusion, however, in this Order the Court will use the terminology of "Defendants" employed by Plaintiff. Moreover, although Defendant Spence continues to refer to himself as "Counter Plaintiff" in pleadings, he asserted no counterclaim in his answer to the amended complaint [*see* Doc. 24].

[2] Plaintiff's reply to Defendants' reply [Doc. 39] is a supplemental brief filed without leave of Court in violation of Eastern District of Tennessee Local Rule 7.1(d). In the future, Plaintiff is instructed to limit her pleadings to conform with applicable local and federal rules.

This matter is ripe. For the reasons stated below, Defendants' motion for summary judgment will be granted in part and denied in part.

## I. BACKGROUND

Defendant Mini Max Storage is a self-serve storage facility located in Chattanooga, Tennessee, where Plaintiff stored a number of her belongings in a total of ten storage units. Defendant Spence purchased the Mini Max facilities and took over the business in August 2013. As set forth in greater detail below, Plaintiff failed to timely pay her rent and other charges for the units, and on November 9, 2013, Defendants sold the contents of Plaintiff's storage units at a public auction. Plaintiff filed the instant suit against Defendants on November 1, 2016, alleging Defendants breached the contract-rental agreements (often referred to herein as "leases") for the storage units, and that Defendants are liable for conversion and fraud. In her original complaint, Plaintiff sought $16,803,501.03 in damages [Doc. 1, Page ID # 1]. Plaintiff later amended her complaint and increased the amount of damages to $22,153,501.03, based on her calculation of the value of the property she had stored at Mini Max [Doc. 19, Page ID # 482].

Through their motion for summary judgment, and in reliance on the Tennessee Self-Service Storage Facility Act, Tenn. Code Ann. §§ 66-31-104 & -105, Defendants argue that they had a lien on Plaintiff's stored personal property and that they properly foreclosed on the lien pursuant to the requirements of the statute when they held the public auction of Plaintiff's belongings; therefore, they are not liable to Plaintiff for any damages. Defendants further argue that, even if they were liable, the leases for nine of the ten units Plaintiff occupied limited the amount of Defendants' liability for a wrongful sale of property to $1,000 per unit.

Defendants also argue that Plaintiff's fraud claim—which is based on an alleged agreement by an employee of Mini Max, Mr. Todd Kyle, to postpone the public auction in exchange for a partial payment of $2,500 toward Plaintiff's past due bill—fails because Plaintiff

2

cannot prove that Mr. Kyle made the agreement or that her reliance on any alleged misrepresentation that the auction would be postponed was reasonable. Finally, Defendants argue that Plaintiff's breach of contract claim based on this same alleged agreement fails because, even if Mr. Kyle did make the agreement and had the authority to do so, there would be no consideration for the agreement because Plaintiff was already legally obligated to pay her past due bill.

Defendants' motion is supported by a memorandum [Doc. 29], the storage unit rental contracts [Doc. 28-1[3]], Plaintiff's deposition testimony [Doc. 28-2[4]], recorded notes concerning Plaintiff's account at Mini Max [Doc. 28-3], the deposition testimony of Plaintiff's cousin Mecshell Wright Ramseur [Doc. 28-4], an affidavit from Defendant Spence [Doc. 28-5], notices of the auction that were mailed to Plaintiff [Doc. 28-6], the newspaper advertisement for the auction [Doc. 28-7], and the deposition testimony of Mr. Nassar Salameh Jaser, a business associate and friend of Plaintiff's [Doc. 28-8].[5]

In response, Plaintiff contends that she was not bound by most of the leases because she did not actually sign them, and the person who did sign them, Plaintiff's cousin Mecshell Wright Ramseur, did not have authority to bind Plaintiff. She relies on the same evidence as Defendants, as well as her own memorandum [Doc. 37-1], emails between Plaintiff and employees of Mini Max concerning the manner in which Plaintiff's payments were applied to her account balance [Doc. 31-18], transcripts of voicemails left on Plaintiff's phone by Defendant Spence and other Mini Max employees [Doc. 31-20], text messages between Plaintiff

---

[3] Copies of the leases are also attached as individual exhibits to Plaintiff's original response to Defendants' motion [Docs. 31-2 through 31-11].

[4] Plaintiff attaches her complete deposition transcript to her original response to Defendants' motion for summary judgment [*see* Docs. 31-12].

[5] Plaintiff also attaches the complete deposition transcript of Ms. Ramseur and Mr. Jaser to her original response to Defendants' motion for summary judgment [*see* Docs. 31-13 & 31-14].

and Mr. Jaser [Doc. 31-21], Defendants' answers to interrogatories [Doc. 31-22], Defendant Mini Max's insurance policy [Doc. 31-23], and Plaintiff's inventory of the items stored in the units [Doc. 31-24]. In her sur-reply and other filings, Plaintiff also cites to Mini Max's phone records [Doc. 36-1].

## II. STANDARD OF REVIEW

Summary judgment is mandatory where "there is no genuine dispute as to any material fact" and the moving party "is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one that *matters*—i.e., a fact that, if found to be true, might "affect the outcome" of the litigation. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). The applicable substantive law provides the frame of reference to determine which facts are material. *Id.* A "genuine" dispute exists with respect to a material fact when the evidence would enable a reasonable jury to find for the non-moving party. *Id.*; *Jones v. Sandusky Cnty., Ohio*, 541 F. App'x 653, 659 (6th Cir. 2013); *Nat'l Satellite Sports, Inc. v. Eliadis Inc.*, 253 F.3d 900, 907 (6th Cir. 2001). In determining whether a dispute is "genuine," the court cannot weigh the evidence or determine the truth of any matter in dispute. *Anderson*, 477 U.S. at 249. Instead, the court must view the facts and all inferences that can be drawn from those facts in the light most favorable to the non-moving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Nat'l Satellite Sports*, 253 F.3d at 907.

The moving party bears the initial burden of demonstrating no genuine issue of material fact exists. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Jones*, 541 F. App'x at 659. To refute such a showing, the non-moving party must present some significant, probative evidence indicating the necessity of a trial for resolving a material, factual dispute. *Celotex*, 477 U.S. at 323. A mere scintilla of evidence is not enough. *Anderson*, 477 U.S. at 252; *McLean v. 988011 Ontario, Ltd.*, 224 F.3d 797, 800 (6th Cir. 2000). The court's role is limited to determining

whether the case contains sufficient evidence from which a jury could reasonably find for the non-moving party. *Anderson*, 477 U.S. at 248, 249; *Nat'l Satellite Sports*, 253 F.3d at 907.

**III. FACTS**

Plaintiff leased her first Mini Max storage unit, unit #163, in 2007 [lease, Doc. 28-1, Page ID # 628-30]. Plaintiff's friend and former business partner, Ms. Derilla Frazier, signed the lease on Plaintiff's behalf on November 21, 2007 [*Id.*]. Plaintiff does not dispute that Ms. Frazier was acting as Plaintiff's agent and that Plaintiff is bound by the terms of this lease [Plaintiff Dep., Doc. 28-2 at Page ID 664, lines 8-13]. Out of the ten leases at issue in this case, the lease for unit #163 is the only one that does not contain a limitation on the value of property that can be stored in the unit [Doc. 28-1, Page ID # 628].

Plaintiff acquired the other nine storage units in late 2012. On November 20, 2012, shortly before moving from Chattanooga to Washington, D.C., Plaintiff signed a lease for Unit #271 [lease, Doc. 28-1 at Page ID # 636-40]. This lease contains a limitation of value paragraph, which provides:

> Customer agrees that in no event shall the total value of all property stored be deemed to exceed $1,000 unless Landlord has given permission in writing for Customer to store property exceeding that value. Customer agrees that the maximum liability of Landlord to Customer for any claim or suit by Customer, including but not limited to any suit which alleges wrongful or improper foreclosure or sale of the contents of a storage unit is the total value referenced above. Nothing in this section shall be deemed to create any liability on the part of Landlord to Customer for any loss or damage to Customer[']s property, regardless of cause.

[Doc. 28-1 at Page ID # 639].

Plaintiff asserts that on November 27, 2017, she "personally acquired" an additional four units: #62, #64, #119, and #135 [*see* Doc. 37-1 at Page ID # 1265]. Within a short span of time thereafter, Plaintiff acquired four more units: #139 on November 28, 2012, #150 on December 3, 2012, #198 on December 5, 2012, and #161 on December 6, 2012 [*id.* at Page ID # 1265-66; *see*

5

*also* leases, Doc. 28-1]. Plaintiff, however, did not actually sign the leases for any of these eight units when she acquired each. Instead, on December 12, 2012, when Plaintiff's cousin, Ms. Ramseur, appeared at Mini Max to place some of Plaintiff's belongings into the storage units [*see* Ramseur Dep., Doc. 31-13 at Page ID #1110], Ms. Ramseur signed her own name and Plaintiff's name to the leases for seven of the eight units, those units being #62, #64, #119, #139, #150, #198, and #161 [*see* leases, Doc. 28-1]. The lease for unit #135 was never signed by anyone.

Plaintiff contends that Ms. Ramseur never had any authority to sign the leases on Plaintiff's behalf [Plaintiff Dep., Doc. 28-2 at Page ID # 665, lines 9-19], and Ms. Ramseur testified in her deposition that she believed she was signing a document simply to gain access to the units [Ramseur Dep., Doc. 28-4 at Page ID # 685, lines 18-25]. Defendants dispute this, and point to a note recorded by a former Mini Max employee which states, "sent cousin to sign leases" [Doc. 28-3 at Page ID # 682]. It is undisputed, however, that Plaintiff did receive copies of three of the eight leases via email, although the copies that Plaintiff received had not yet been signed by her cousin [Plaintiff Dep., Doc. 28-2 at Page ID # 666, lines 6-22].

It is worth noting that all eight leases (including the three that were emailed to Plaintiff) were identical to the lease Plaintiff signed for unit #271 on November 20, 2012, and included the limitation of value paragraph [*see* leases, Doc. 28-1]. It is also worth noting that, after receiving the emailed copies of the leases, Plaintiff continued to make payments to Mini Max, albeit somewhat sporadically [*see* Mini Max account notes, Doc. 28-3 at Page ID # 682; emails between Plaintiff and Mini Max, Doc. 31-18 at Page ID # 1140].

By August 2013, when Defendant Spence purchased Mini Max, Plaintiff was in default on all ten of her units for failing to pay rent [Spence Aff., Doc. 28-5 at Page ID # 689, ¶ 4].

When Plaintiff did make a payment, the payment was divided across each of the ten units, rather than applied to satisfy the balance on one particular unit [emails, Doc. 31-18 at Page ID # 1156].

On October 1, 2013, an employee of Mini Max mailed ten separate "Auction Notifications" to Plaintiff's former address in Chattanooga [Doc. 28-6]. The Notifications informed Plaintiff that her right to access the storage units had been terminated and that Mini Max would auction the contents of the units "on or after" November 2, 2013, at 9:00 a.m., unless Plaintiff paid the balances owed prior to that date [*id.*]. Plaintiff contends that she did not receive the notices; regardless, at some point she discovered Defendants intended to auction the contents of her storage units. Therefore, on October 31, 2013, Plaintiff's friend Elaine Powe contacted Mini Max and inquired about making a partial payment to avoid the auction [Powe Aff., Doc. 31-15 at Page ID #1133].

According to her affidavit, Ms. Powe spoke with Mr. Todd Kyle, an employee of Mini Max, who, after checking with his boss (presumably Defendant Spence), agreed to accept a $2,500 payment from Plaintiff to "stop the sale of the 10 units on November 2, 2013" and to "give her time to pay whatever balance in a few days." [*id.* at Page ID # 1133-34]. Ms. Powe then made the $2,500 payment on November 1 [*id.* at Page ID # 1133]. Plaintiff claims that Mr. Kyle agreed to postpone the auction until November 22 as a result of this payment [*see* Doc. 19 at Page ID # 499], although Ms. Powe does not specifically attest to the November 22 date. Defendant Spence denies having made such an agreement, and claims that "[t]he only way I was going to refrain from auctioning Plaintiff's property was if I received payment in full of her arrearages, as stated in the auction notices." [Spence Aff., Doc. 28-5 at Page ID # 690, ¶ 8-11].

For reasons not clear from the record, the auction was nevertheless delayed until November 9, 2013. On November 3, six days prior to the auction, Defendant Spence published a notice in the Chattanooga Times Free Press which provides, in its entirety:

7

> PUBLIC AUCTION
> Mini Max Storage
> 1415 Crawford St.
> Chattanooga, Tn 37421
> 423-894-9191
> List for Auction to be held at 10:00 AM on November 9, 2013
> Units- 62, 64, 119, 135, 139, 150, 161, 163, 198, 271- Howard Hill
> Unit- 38 Vickie Bell
> Unit- 224 Aaron Financial Services
> Unit- 272 Ben Suggs

[Doc. 28-7 at Page ID # 715]. On November 8, according to his affidavit, Defendant Spence called Plaintiff "in an attempt to work something out so that she could keep at least some of her property," but "no agreement was ever reached." [Spence Aff., Doc. 28-5 at Page ID # 690, ¶ 12].

Plaintiff also spoke to her friend, Mr. Nassar Salameh Jaser, on November 8, and told him about the impending auction. Mr. Jaser owned an empty building in Chattanooga where Plaintiff was considering moving her belongings for storage [Jaser Dep., Doc. 31-14 at Page ID # 1123]. Plaintiff asked Mr. Jaser to contact Defendant Spence and essentially settle her tab with Mini Max; Plaintiff would then pay Mr. Jaser back, move her belongings, and take over the mortgage payment on Mr. Jaser's building [*id.* at Page ID # 1123-24]. Mr. Jaser testified, however, that when he called Mini Max on the morning of the auction to pay the balance, the employee on duty refused to speak with him regarding Plaintiff's account [*id.* at Page ID # 1124]. Mr. Jaser did not attempt to bid at the auction, or otherwise appear in person to pay the bill [*id.* at Page ID # 1130].

Defendant Spence therefore proceeded with the auction of Plaintiff's units on November 9, 2013. According to Defendant Spence's affidavit, the total amount yielded from the auction that day, which included a number of units not leased by Plaintiff, was $2,400 [Spence Aff., Doc. 28-5 at Page ID # 690, ¶ 15].

Plaintiff filed suit on November 1, 2016 [Doc. 1], and filed an amended complaint on May 5, 2017 [Doc. 19]. Through her amended complaint, Plaintiff asserts claims for breach of contract, fraud, and conversion [*id.*]. Specifically, she claims Defendants breached the rental contracts and committed conversion when they refused to allow her to make payments on her individual units and eventually auctioned off her belongings [*id.* at Page ID # 498-501]. She further claims that the alleged agreement to delay the auction until November 22 in exchange for her partial payment of $2,500 "constituted a new agreement and/or altered the terms of any original or written contracts between the Plaintiff and Defendant," which Defendants breached when they held the auction [*id.* at Page ID # 499-500]. Plaintiff also asserts that Defendants' refusal to postpone the auction until November 22 in light of the $2500 payment constitutes fraud, and that Defendants cannot assert any counterclaims against her for any unpaid rent or other fees under the doctrine of unclean hands [*id.* at Page ID # 500, 502-03]. She seeks "monetary and punitive damages in the amount of $22,153,501.03." [*id.* at Page ID # 505].

In response to Plaintiff's original complaint, Defendants filed an answer and counterclaim for breach of contract, seeking "unpaid rent, late fees, attorney fees, costs and interest in an amount not to exceed $20,000.00." [Doc. 5 at Page ID # 72]. As previously noted, Defendants' response to the amended complaint does not assert a counterclaim [*see* Docs. 24].[6]

---

[6] When Plaintiff sought leave to file the amended complaint [Doc. 12], Defendants filed a response (1) stating that they had no opposition to the motion, and (2) attempting to adopt the original answer to the complaint as the response to the amended complaint [*see* Doc. 14]. The Court granted the motion to amend on April 17, 2017 [Doc. 16]. In doing so, the Court specifically noted that Defendants could not adopt verbatim their original answer to the complaint as their response to the amended complaint and that they were required to file a timely answer to the amended complaint after it was filed [Doc. 16]. *See also In re Refrigerant Compressors Antitrust Litig.*, 731 F.3d 586, 589 (6th Cir. 2013) (holding that an "amended complaint supersedes an earlier complaint for all purposes.") (citing *Pac. Bell Tel. Co. v. Linkline Commc'ns, Inc.*, 555 U.S. 438, 456 n.4 (2009)).

## IV. ANALYSIS

### A. The Tennessee Self-Service Storage Facility Act

Defendants' primary argument for summary judgment is that they have no liability to Plaintiff arising from the sale of her stored items, because they complied with the applicable provisions of the Tennessee Self-Service Storage Facility Act, which gave them a lien on Plaintiff's stored property and empowered them to enforce the lien in the event of Plaintiff's default on the leases. *See* Tenn. Code Ann. §§ 66-31-104 & -105. It is unnecessary to go through each of the requirements of the lien enforcement statute (Tenn. Code Ann. § 66-31-105), because the Court readily concludes Defendants failed to comply with subsection (2)(F), and the Act requires strict compliance with subsection (2)(F). *See* Tenn. Code Ann. § 66-31-105(2)(N) ("An owner shall not be entitled to any remedies provided by this chapter, including but not limited to, enforcement of a lien against an occupant, if: . . . (ii) The sale of the personal property in the leased space is not in conformity with subdivision (2)(F).").

Subsection (2)(F) requires that any auction of the contents of a storage unit be advertised in "a newspaper of general circulation which serves the area where the self storage facility is located," and that:

> [t]he advertisement shall include:
>
> (i) A statement that the contents of the occupant's leased space shall be sold to satisfy the owner's lien;
>
> (ii) The address of the self-service storage facility and the number or other description, if any, of the space where the personal property is located and the name of the occupant; and
>
> (iii) The time, place, and manner of the sale . . . .

Tenn. Code Ann. § 66-31-105(2)(F). Defendants' advertisement [Doc. 28-7] included the address of the facility and "the time, place, and manner of the sale," but it did not include a "statement that the contents of the occupant's leased space shall be sold to satisfy the owner's

lien." [*id.*] As a result, Defendants are not entitled to summary judgment under the lien enforcement provisions of the Tennessee Self-Service Storage Facility Act.[7]

### B. Limitation of Value Paragraph

Defendants next argue that the leases for nine of the ten units limit Plaintiff's recovery to $1,000 per unit. Nine of the ten leases at issue do indeed include the following "Limitation of Value" paragraph:

> Customer agrees that in no event shall the total value of all property stored be deemed to exceed $1,000 unless Landlord has given permission in writing for Customer to store property exceeding that value. Customer agrees that the maximum liability of Landlord to Customer for any claim or suit by Customer, including but not limited to any suit which alleges wrongful or improper foreclosure or sale of the contents of a storage unit is the total value referenced above.

[*See, e.g.*, lease for unit #139, Doc. 28-1 at Page ID # 616[8]].

Plaintiff seems to acknowledge that she is bound by this limitation of value for unit #271, which she personally signed [Doc. 37-1 at Page ID # 1265 ("Plaintiff does not contest the

---

[7] The Court acknowledges that the Self-Service Storage Facility Act provides that "[n]othing in this chapter shall be construed as in any manner impairing or affecting the right of the parties to create additional rights, duties, and obligations in and by virtue of the rental agreement." Tenn. Code Ann. § 66-31-106(a). However, the leases at issue in this case do not reference any sort of contractual lien beyond what is provided for in the statute. The leases provide:

> Pursuant to the Tennessee Self-Service Storage Facility Act, Landlord has a lien upon all property in the Storage Space. If Customer fails to pay the monthly Rent when due, Landlord may deny Customer access to the Premises and the Storage Space. Landlord, without notice, not less than five (5) days after the Rent is due, may enter and remove property from the Storage Space to other suitable storage space pending its sale or other disposition. Customer[']s property may be sold or otherwise dispose[d] of if no payment has been received for a continuous fifteen day period when due to satisfy the lien.

[*See, e.g.*, lease for unit #139, Doc. 28-1 at Page ID # 615].

[8] The Self-Service Storage Facility Act expressly permits a limitation of value provision in a storage unit lease. *See* Tenn. Code Ann. § 66-31-104(b) ("If the rental agreement contains a limit on the value of property stored in the occupant's storage space, the limit shall be deemed to be the maximum value of the property stored in that space.").

11

acquiring of Unit 271 on November 20, 2012, as evidenced by the signed contract presented as PLAINTIFF'S EXHIBIT 2."), at Page ID # 1281 ("Plaintiff contends that there are only two contracts that were legally binding"). *See also 84 Lumber v. Smith*, 356 S.W.3d 380, 383 (Tenn. 2011) ("It is a bedrock principle of contract law that an individual who signs a contract is presumed to have read the contract and is bound by its contents. . . . To hold otherwise would make contracts not 'worth the paper on which they are written." (internal quotation marks and citations omitted))]. And, for their part, Defendants seem to acknowledge (as they must) that the lease for unit #163 does not contain any such limitation of value provision.

Hence, the dispute concerning the contractual limitation of value only concerns the seven leases signed by Plaintiff's cousin, Ms. Ramseur (for units #62, #64, #119, #139, #150, #161, and #198), and the one unsigned lease (for unit #135). As explained below, the Court concludes that Plaintiff is bound by the terms of these leases, including the limitation of value provisions, regardless of the fact that she did not personally sign them. Therefore, the Court will grant the aspect of Defendants' motion for summary judgment seeking a finding that Plaintiff is bound by the terms of the leases, including the limitation of value provisions, for units #62, #64, #119, #135, #139, #150, #161, #198, and #271.

Plaintiff acknowledges that she was required by the leases to make payments in order to continue storing her belongings at Mini Max [Plaintiff Dep., Doc. 28-2 at Page ID # 665]. She nevertheless takes the position that she is not bound by the remaining terms of the leases as written, claiming that there was no meeting of the minds [*see* Doc. 37-1 at Page ID # 1286-88].

As Defendants point out, the law regarding whether the terms of a contract or lease are enforceable is well established in Tennessee:

> It is well established in Tennessee that, in order to be enforceable, a contract must represent mutual assent to its terms, be supported by sufficient consideration, be free from fraud and undue influence, be sufficiently definite, and must not be contrary to public policy. *Johnson v. Central Nat'l Ins. Co.*, 210

Tenn. 24, 356 S.W.2d 277, 281 (1961). Such a contract can be expressed or implied, written or oral. *Id.* A written contract does not have to signed to be binding on the parties. *See Remco Equip. Sales, Inc. v. Manz*, 952 S.W.2d 437, 438 (Tenn. App. 1997). Similarly, when an agreement is reduced to writing but is signed by only one of the parties, it is binding on the non-signing party if that party has manifested consent to its terms. *Southern Motor Car Co. v. Talliaferro*, 14 Tenn. App. 276, 1931 WL 1595, at *3 (Tenn. Ct. App. March 5, 1932) (*cert. denied*). What is critical is mutual assent to be bound. In determining mutuality of assent, courts use an objective standard based on the manifestations of the parties. 11 Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 30:6 (4th ed. 1999). Assent can be established by the course of dealing of the parties. *Remco Equip. Sales*, 952 S.W.2d at 439. In determining whether a contract exists, the court also can consider relevant evidence such as whether the parties performed under its terms. 11 Williston & Lord, § 30.3. When a party who has not signed a contract has nonetheless manifested consent by performing under it and making payments conforming to its terms, that party is estopped from denying that the parties had a meeting of the minds sufficient to bind them to the contract. *R.J. Betterton Management Serv., Inc. v. Whittemore*, 769 S.W.2d 214, 216 (Tenn. Ct. App. 1989).

*T.R. Mills Contractors, Inc. v. WRH Enters., LLC*, 93 S.W.3d 861, 865-66 (Tenn. Ct. App. 2002).

It is undisputed that Plaintiff personally signed the written lease for unit #271 on November 20, 2012, and that this lease contained the limitation of value paragraph. Over the course of the next few weeks, she acquired eight more units without personally signing the leases for those units; however, she received email copies of at least three of the leases for those additional units, all of which were identical to the lease for unit #271 [*see* Plaintiff's Dep., Doc. 31-12 at Page ID # 1089; leases, Doc. 28-1]. She acknowledges that she received the emailed leases, although she denies having actually reviewed the leases [Plaintiff Dep., Doc. 31-12 at Page ID # 1089]. Plaintiff proceeded to store her belongings in the storage units, and to make payments under the leases for the next nine months.

The Court agrees with Defendants that these circumstances show mutuality of assent to the terms of the leases as written, including the limitation of value paragraph. *See, e.g.*, *T.R. Mills Contractors*, 93 S.W.3d at 867 (mutual assent found where the defendant "knew" the

plaintiff "had submitted the written contract . . . and did nothing to suggest that he did not assent to its terms," and where the defendant "had executed the . . . form contract on other projects, and so had reason to know its terms and conditions"). Plaintiff claims that there was no mutual assent to the leases because Defendants refused to apply her payments to individual units; instead, they "batched" her payments, meaning they evenly divided her payments across all of her units, such that even when she made large payments, she never satisfied her obligations with regard to any single unit [*see* Doc. 37-1 at Page ID # 1287-88]. Plaintiff points out that she began protesting the "batching" of her payments as early as February 2013, or less than two months after she acquired nine of her ten units [*id.* at Page ID # 1287]. The Court is not persuaded by this argument.

Plaintiff does not point to any part of the lease which prohibits the so-called "batching" of her payments;[9] the evidence she presents shows that Mini Max employees consistently told her via email that they could not apply her payments to individual units due to the payment processing "system" used at Mini Max, although it appears they made one exception in late March 2013 [*see* emails, Doc. 31-18 at Page ID # 1155-56]. In any event, Plaintiff fails to explain how the parties' failure to agree on this point indicates a lack of mutual assent to the terms of the leases, especially in light of the fact that Plaintiff continued to store her belongings at Mini Max for months after being repeatedly told by Mini Max employees that her payments would be "batched" rather than applied to individual units.

---

[9] The only relevant provision on this issue that the Court could identify provides that, "[p]ayments made by Customer will always be applied first to the oldest charges on the Customer[']s account," which at first blush seems to support batching [*see*, e.g., lease for unit # 139, Doc. 28-1 at Page ID # 614]. Neither party addressed the relevance of this particular provision, and Defendants did not ask for summary judgment on Plaintiff's breach of contract/conversion claims concerning the "batching" on the basis that the leases did not prohibit batching.

Plaintiff also briefly argues that she had no reason to believe that the nine leases executed in 2012 were any different from the lease executed in 2007, which did not contain a limitation of value paragraph [Doc. 37-1 at Page ID # 1269 ("But primarily, the reason why [Plaintiff] did not thoroughly read or feel the need to read the contract, was because Plaintiff believed the contracts were the same as the contract for the first unit rented. Not having any reason to believe differently, since she was not advised that the contracts were different, she signed the first and only signed contract for Unit #271.")]. This could be liberally construed as an argument that, due to the parties' prior course of conduct, there was no mutual assent to the limitation of value paragraph in the 2012 leases. The Court is cognizant of the standards for summary judgment, but nevertheless concludes that the above analysis should not change simply because the 2007 lease for unit #163 [Doc. 28-1 at Page ID # 628] does not contain a limitation of value paragraph. Because Plaintiff personally signed the lease for unit #271, received copies of the leases for at least three other units, and performed under those leases for almost a year before the dispute arose, the Court finds Plaintiff was on notice that Mini Max's policies had changed since 2007.

The parties argue at length about whether Ms. Ramseur had apparent authority to bind Plaintiff to the leases; however, the Court concludes that whether Ms. Ramseur had apparent or actual authority to sign the leases on Plaintiff's behalf is not determinative of whether Plaintiff is bound by the limitation of value paragraph in nine of the ten leases.[10] As discussed above, the Court concludes that Plaintiff assented to the terms of the contracts by signing the lease to unit #271, receiving the identical emailed leases from Mini Max, and continuing to store her property in the units and make payments on the leases for over nine months. That several leases were signed by Ms. Ramseur only weakens Plaintiff's arguments to the contrary.

---

[10] Whether Ms. Ramseur knew she was signing a lease is disputed [*see* Ramseur Dep., Doc. 28-4 at Page ID # 685, lines 18-25].

For these reasons, the Court will grant Defendants' motion for summary judgment to the extent Defendants seek a finding that Plaintiff is bound by the terms of the leases, including the limitation of value provisions, for units #62, #64, #119, #135, #139, #150, #161, #198, and #271. As a result, the maximum liability of Defendants for any claim or suit by Plaintiff, including but not limited to claims of wrongful or improper foreclosure or sale of the contents of these units is limited to $1,000 per unit on units #62, #64, #119, #135, #139, #150, #161, #198, and #271. For clarity's sake, the Court notes that unit #163 contains no such limitation of value provision.

### C. Plaintiff's Claims Arising from Defendants' Alleged Agreement to Postpone the Auction

As discussed above, Plaintiff's amended complaint includes claims for breach of contract and fraud arising from the alleged agreement that Todd Kyle made (on behalf of Mini Max) with Ms. Powe (on behalf of Plaintiff) to postpone the auction date to November 22 in exchange for a partial payment of $2,500 [Doc. 19 at Page ID # 499-500, 502-03]. Defendants argue these particular claims should be dismissed because Mr. Kyle will not testify, and Plaintiff cannot produce any other admissible evidence that Defendants agreed to postpone the auction date [Doc. 29 at Page ID # 729-30]. Specifically regarding Plaintiff's fraud claim, Defendants further argue that Plaintiff "admitted in her Complaint that she was aware the auction was going forward before her things were sold, and as such, she did not reasonably rely on any alleged misrepresentation from Mr. Kyle." [Doc. 29 at Page ID # 729 (citing Plaintiff's amended complaint, Doc. 19 at ¶ 58, Page ID # 496)]. Defendants' arguments fail.

Regarding the evidentiary issue, Plaintiff was granted leave to amend her witness list to include Ms. Powe, who now may be able to testify about whether she reached an agreement with Mr. Kyle to postpone the auction in exchange for the $2,500 payment made on November 1 [*see* Doc. 40 (order); *see also* Powe Aff. Doc. 31-15]. Moreover, according to Plaintiff and Ms. Powe, any agreement with Mr. Kyle was made after he consulted with Defendant Spence. At

16

least at this juncture, it is not immediately apparent why Mr. Kyle's alleged statements to Ms. Powe are not admissible. *See* Fed. R. of Evid. 801(d)(2). And, while Plaintiff's amended complaint states that she was aware on November 8, 2013, that the auction was going forward, there is a question of fact concerning whether Plaintiff reasonably relied on Mr. Kyle's alleged misrepresentation that the auction would be delayed until November 22 when she allegedly made the agreement and payment, and then only later learned that the auction would proceed.

Defendants further argue in their reply that Plaintiff's breach of contract claim arising from this alleged agreement fails due to a lack of consideration [Doc. 35 at Page ID # 1246-48]. Specifically, Defendants argue that the $2,500 does not constitute consideration because Plaintiff undisputedly already owed Defendants over $4,000 for past due rent under the leases [*Id.*]. While the Court typically will not address a new argument raised in a reply, Plaintiff was allowed to file a sur-reply in this case. In any event, the Court does not find Defendants' arguments persuasive.

True, an amendment to an existing contract requires consideration. *See E&A Northeast Ltd. P'ship v. Music City Record Distribs., Inc.*, No. M2005-01207-COA-R3-CV, 2007 WL 858779, at *5 (Tenn. Ct. App. Mar. 21, 2007) (citing *Dunlop Tire & Rubber Corp. v. Service Merchandise*, 667 S.W.2d 754, 548 (Tenn. Ct. App. 1983) ("Another long-standing principal of contract law . . . is that an alteration or amendment to an existing contract must be supported by consideration."). Moreover, "[i]t is well-settled that consideration exists when the promisee does something that it is under no legal obligation to do or refrains from doing something which it has a legal right to do." *Brown Oil Co. v. Johnson*, 689 S.W.2d 149, 151 (Tenn. 1985); *see also GuestHouse Intern., LLC v. Shoney's N. America Corp.*, 330 S.W.3d 166, 188 (Tenn. Ct. App. 2010) (internal citations omitted). "For there to be consideration in a contract between parties to the contract it is not necessary that something concrete and intangible move from one to the

other. Any benefit to one and detriment to the other may be a sufficient consideration." *GuestHouse Inter.*, 330 S.W. at 189 (internal citation and quotation marks omitted). "In determining whether an agreement is supported by consideration, we view the agreement in its entirety, 'not as separate, unrelated sets of promises.'" *Id.* at 188-89 (quoting *Anesthesia Med. Grp., P.C. v. Chandler*, No. M2005-00034-COA-R3-CV, 2007 WL 412323, at *6 (Tenn. Ct. App. Feb. 6, 2007)). However, the Court concludes that Defendants' argument concerning a lack of consideration fails at the summary judgment stage of these proceedings.

Defendants make one final argument addressing Plaintiff's contention that the alleged arrangement with Todd Kyle was a valid contract modification or contract implied in fact. They point out that Plaintiff acknowledges in her amended complaint that she was aware (as of November 8) the auction was going to proceed on November 9, and she had to pay the balance of $1,526 in order to stop the auction [Doc. 35 at Page ID # 1248]. They then argue that this awareness "equally constitutes a valid contract modification," which required Plaintiff "to pay her full arrearages by the auction date, and Mr. Spence would not auction her property." [Doc. 35 at Page ID # 1248]. However, Defendants did not address the lease provision that requires a signed writing to modify the lease terms and they did not sufficiently develop this convoluted argument for the Court to understand and rule upon it as a matter of law.

For these reasons, the Court concludes Defendants are not entitled to summary judgment on Plaintiff's breach of contract and fraud claims arising from the alleged agreement between Ms. Powe and Mr. Kyle to postpone the auction date in exchange for a partial payment of $2,500.

V. **CONCLUSION**

For the reasons stated above, Plaintiff's motion to amend her memorandum in opposition to Defendants' motion for summary judgment [Doc. 37] is **GRANTED**. Defendants' motion for

summary judgment [Doc. 28] is hereby **GRANTED IN PART** and **DENIED IN PART**.  The motion is **GRANTED** to the extent Defendants seek a finding that Plaintiff is bound by the terms of the leases, including the limitation of value provisions, for units #62, #64, #119, #135, #139, #150, #161, #198, and #271.  As a result, the maximum liability of Defendants for any claim or suit by Plaintiff, including but not limited to claims of wrongful or improper foreclosure or sale of the contents of these units is limited to $1,000 per unit on units #62, #64, #119, #135, #139, #150, #161, #198, and #271.  For clarity's sake, the Court notes that unit #163 contains no such limitation of value provision.   Defendants' motion is **DENIED** to the extent it seeks summary judgment based on the Tennessee Self-Service Storage Facility Act, Tenn. Code Ann. §§ 66-31-104 & -105, and to the extent it seeks summary judgment on Plaintiff's fraud and breach of contract claims arising from the alleged agreement to postpone the auction.

    SO ORDERED.

    ENTER:

*s/ Susan K. Lee*
SUSAN K. LEE
UNITED STATES MAGISTRATE JUDGE